IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FOG CAP ACCEPTANCE, INC., and FOG
CUTTER CAPITAL GROUP, INC.,

        Plaintiffs,

                                     3:11-CV-724-PK

                                     OPINION AND

v.                                  ORDER

VERIZON BUSINESS NETWORK SERVICES,
INC., VERIZON GLOBAL NETWORKS, INC.,
MCI COMMUNICATIONS SERVICES, INC.,
and JOHN DOE,

        Defendants.

_____

PAPAK, Magistrate Judge:

    Plaintiffs Fog Cap Acceptance, Inc. ("FCA"), and Fog Cutter Capital Group, Inc.

("FCCG" and, collectively with FCA, "Fog Cap"), filed this action against Verizon

Communications, Inc. ("VCI "), Verizon Business Network Services, Inc. ("VBNS"), an entity

Page 1 - OPINION AND ORDER

identified by Fog Cap as CA, Inc. ("CAT")[1], and an unidentified corporate subsidiary of VCI

fictitiously identified as "John Doe" in the Multnomah County Circuit Court for the State of

Oregon on April 22, 2011. On or around April 28, 2011, Fog Cap amended its state-court

complaint, and on June 16, 2011, defendant CAT removed Fog Cap's action to this court.

Fog Cap amended its complaint in this court on August 17, 2011, naming as defendants

VCI, VBNS, Verizon Global Networks, Inc. ("VGN"), MCI Communications Services, Inc.

(formerly known as MCI WorldCom Communications and operating under the assumed business

name Verizon Business Services) ("MCI"), CAT, and John Doe. On October 21, 2011, pursuant

to the parties' stipulation, I dismissed defendant VCI from this action. Likewise based on the

parties' stipulation, I dismissed defendant CAT from this action on October 24, 2011. Fog Cap

amended its complaint again on July 27, 2012, and a fourth time on October 19, 2012. By and

through its fourth amended complaint, Fog Cap alleged the liability of remaining defendants

VBNS, VGN, MCI (collectively with VBNS and VGN, "Verizon"), and Doe for breach of

contract, negligence, and violation of bailment. On November 7, 2014, Fog Cap voluntarily

dismissed its claims against the Doe entity.

Now before the court are Verizon's motion (#102) for imposition of sanctions and

Verizon's motion (#108) for summary judgment. I have considered the motions, all of the papers

and pleadings on file, and oral argument on behalf of the parties. For the reasons set forth below,

Verizon's motion (#102) for imposition of sanctions is denied as moot, and Verizon's motion

(#108) for summary judgment is granted in its entirety.

---

[1] It appears that, at all material times, the entity identified by Fog Cap as "CA, Inc." had
the legal name "CA Technologies, Inc."

## LEGAL STANDARDS

### I.    Motion for Imposition of Sanctions

"A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1328 (9th Cir.1993).  That is, the district courts enjoy the discretion and authority to impose sanctions based on their inherent power "to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (citations omitted).  Sanctions available in connection with spoliation include dismissal of claims, exclusion of evidence, and adverse jury instructions. *See id.* at 368-370.

### II.    Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c).  The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g.,* *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996).  In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g.,* *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## MATERIAL FACTS

### I.    The Parties

Plaintiff FCA is incorporated under the laws of the State of Delaware, with its principal place of business in California.  Plaintiff FCCG is incorporated under the laws of the State of Maryland, with its principal place of business in California.  Plaintiffs are principally in the business of providing short-term bridge-financing loans to companies that do not qualify for more traditional financing.

Defendant VBNS is and at all material times was a Delaware corporation with its principal place of business in Virginia.  Defendant VBNS is in the business, among others, of hosting networked servers for software technology companies.  Defendants MCI and VGN are predecessors in interest of VBNS, and no longer maintain separate legal existence from VBNS.

### II.   The Parties' Dispute

In December 2004, Fog Cap extended the first of a series of loans that would ultimately total in excess of $7.5 million to the Centrisoft Corporation ("Centrisoft").  Centrisoft was at that

time a Portland-based startup company developing a software tool to allow users to meter and allocate internet bandwidth from a central hosted location.

In June 2005, Centrisoft entered into a Hosting Agreement and a Reseller Agreement with MCI, each of which contained a provision that it was to be governed by New York law. Pursuant to the Centrisoft/MCI Hosting Agreement, MCI agreed to "host" four Centrisoft servers. Under the terms of the parties' agreement, Centrisoft at all times had unfettered access to the hosted servers and to all data stored thereon, including the ability to download contents therefrom without limitation. The Hosting Agreement provided that MCI would perform "daily and weekly backups" of all of the content stored on Centrisoft's servers, and that it would store and maintain all such backup data "in accordance with MCI's standards for backup data retention" for a period of not less than ninety days, with the express proviso that "in order to be properly backed up," "[Centrisoft]-created databases [would] require additional setup by [Centrisoft]." By and through the Hosting Agreement, MCI agreed that, in the event of a "failure" of one or more of Centrisoft's hosted servers, MCI would "restore such Device from the most recent backup data." However, MCI did not expressly guarantee that such restoration would be to Centrisoft's satisfaction, but rather expressly made "no warranties, express or implied" regarding its backup services and expressly "disclaim[ed] any and all implied warranties" in connection with its provision of services under the Hosting Agreement. The Hosting Agreement additionally contained a liability limitation provision limiting MCI's potential liability to Centrisoft as follows:

> The total liability of MCI to [Centrisoft] in connection with this [Hosting] Agreement, for any and all causes of action and claims, including, without limitation, breach of contract, breach of warranty, negligence, strict liability, misrepresentation and other torts, shall be limited to the lesser of: (a) direct damges proven by [Centrisoft]; or (b) the amount paid by [Centrisoft] to MCI

under this [Hosting] [A]greement for the 6 month period prior to accrual of the most recent cause of action. Nothing in this section shall limit MCI's liability: (a) in tort for its willful or intentional misconduct; or (b) for bodily injury or death proximately caused by MCI's negligence; or (c) loss or damage to real property or tangible personal property proximately caused by MCI's negligence.

In addition, the Hosting Agreement expressly provided that:

This [Hosting] Agreement (and any Attachments and other documents incorporated herein by reference) constitutes the entire agreement between the parties with respect to the Services provided under this Agreement and supersedes all other representations, understandings or agreements that are not expressed herein, whether oral or written. Except as otherwise set forth herein, no amendment to this [Hosting] Agreement shall be valid unless signed by [Centrisoft] and accepted by MCI.

Pursuant to the Centrisoft/MCI Reseller Agreement, the parties agreed that MCI would have the non-exclusive right to sell Centrisoft's software product and related services (including installation, technical support, maintenance, implementation, configuration, integration, development, and other related services, all such services to be performed by Centrisoft) to interested customers. The agreement provided that in the event either party disclosed confidential information related to the agreement or in the course of the performance of the agreement to the other party (where confidential information is defined as information "that should reasonably have been understood" by the receiving party "to be proprietary and confidential" to the disclosing party), the receiving party would be obliged either to return or destroy all such information "promptly upon the earlier of" either the disclosing party's written request or the termination of the agreement. The Reseller Agreement additionally contained a two-way **"LIMITATION OF ACTIONS AND LIABILITIES"** provision set forth in majuscule letters and bolded font in relevant part as follows:

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW,**

**NEITHER PARTY . . . SHALL BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER, INCLUDING LOST OR ANTICIPATED PROFITS, BASED ON ANY BREACH OR OTHER ACT OR OMISSION ARISING OUT OF, RELATING TO, OR OCCURRING IN CONNECTION WITH, THIS [RESELLER] AGREEMENT.  THESE LIMITATIONS SHALL APPLY REGARDLESS OF WHETHER THE LIABILITY ARISES OUT OF BREACH OF CONTRACT, BREACH OF WARRANTY, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR ANY OTHER THEORY.  THESE LIMITATIONS SHALL IN ALL CASES BE DEEMED INDEPENDENT OF EACH AND EVERY REMEDY PROVIDED IN THIS AGREEMENT AND ARE INTENDED BY THE PARTIES TO SURVIVE AND TO BE ENFORCEABLE EVEN IF THE AVAILABLE REMEDIES DO NOT PROVIDE ADEQUATE COMPENSATION, FAIL OF THEIR ESSENTIAL PURPOSE, OR ARE DETERMINED TO BE UNCONSCIONABLE.**

Like the parties' Hosting Agreement, the Reseller Agreement expressly provided that:

> This [Reseller] Agreement, including Exhibits, constitutes the entire understanding of the Parties, and supersedes all prior or contemporaneous written and oral agreements, representations, or negotiations, with respect to the subject matter hereof.  This [Reseller] Agreement may not be modified or amended except in writing signed by the duly authorized representative of [Centrisoft] and the duly authorized representative of [MCI]'s Procurement Department.

The parties' Reseller Agreement provided a mechanism for its own termination either for convenience or for cause, and the parties' Hosting Agreement provided that it could be terminated upon termination of the Reseller Agreement.

The parties agree that at all material times a "production copy" of Centrisoft's software product (*i.e.* the compiled "object code" of the software product) was stored on one or more of the Centrisoft servers hosted by MCI (and later by VBNS), and that the underlying "source code" was never at any time stored on the hosted machines.  There further appears to be no dispute that the Centrisoft software required multiple databases in order to run.  There is no evidence of

record to indicate that Centrisoft ever performed the "additional setup" required under the Hosting Agreement to ensure that backup of the requisite databases would be effective.

In or around January 2006, VBNS, VGN and MCI merged, and Verizon assumed all of MCI's rights and responsibilities under its agreements with Centrisoft.

In June 2008, Centrisoft having defaulted on its loans to Fog Cap, Fog Cap foreclosed its loans and acquired all of Centrisoft's assets, including in particular its software product, and assumed all of Centrisoft's rights and responsibilities under its agreements with Verizon. Fog Cap terminated the employment of all Centrisoft's employees other than that of Centrisoft's Director of Sales and of a single Centrisoft software engineer, Michael Newton, but nevertheless attempted to continue running the company and developing its software product with just those two employees. Over the course of the following year, Newton continued to develop the software, specifically in an effort to make it compatible with the latest version of the Windows operating system, as the company's sole software engineer. Nevertheless, in 2008 Fog Cap reported to the SEC that it had written the value of its investment in Centrisoft down to zero.

In early 2009, consistently with its rights under the parties' agreements, Verizon provided Centrisoft and Fog Cap with ninety days' notice of its intention to terminate the Reseller Agreement and Hosting Agreement. By April 2009, Fog Cap did not have actual knowledge of any "working" or "operational" copy of the Centrisoft software product – *i.e.*, of any compiled, object-code instance or production copy of the software – other than the one stored on one of the servers then hosted by Verizon for purposes of resale to Verizon's customers. In April 2009, representatives of Verizon and Fog Cap participated in a conference call during the course of which Fog Cap's representatives orally represented to Verizon that Fog Cap "absolutely needed

the software to remain in place" and in consequence requested that Verizon return Centrisoft's servers to Fog Cap with all data intact, including in particular the production copy of the Centrisoft software, notwithstanding Verizon's standard policy of erasing all data from hosted servers before returning them. Verizon orally agreed to that request.

Subsequently, in May 2009, Verizon returned Centrisoft's servers to Fog Cap. Despite its oral expression of assent to Fog Cap's request that data on the servers be left intact, Verizon erased all data on the servers before returning them, pursuant to its standard procedures. Fog Cap did not take immediate action to notify Verizon of its failure to comply with Fog Cap's request of April 2009, to restore the data erased from the servers, to recompile the software from the source code within its possession or control, or to locate any other operational copy of the software.

Fog Cap dissolved Centrisoft entirely in June 2009, and Newton's employment as Centrisoft's sole software engineer was terminated. Newton testifies that at the time his employment with Centrisoft ended, he had copies of the most up-to-date version of Centrisoft's software product stored on disks in his home office, but that Fog Cap never asked him for the software either during or after his employment. Newton cannot now locate those disks, and although he does not remember doing so, he believes he must have discarded them at some time after his employment ended.

In or around June 2009, Fog Cap asked Verizon to restore the data on one of the erased servers from its backups, which at that time Verizon still retained, pursuant to its continuing obligations under the parties' Hosting Agreement. In June and July 2009, Verizon attempted the requested restoration, but Fog Cap was unable to run an operational version of the software product on the restored server. Verizon offers the opinion testimony of its forensics expert

Page 9 - OPINION AND ORDER

Richard Gralnik and of VBNS' Manager of Infrastructure Engineering Anne Wilson that,

notwithstanding Fog Cap's failure to run the Centrisoft software on the restored server, the

restoration procedure was in fact successfully completed, and that Fog Cap's failure to run the

software was most likely due to its prior failure properly to use Verizon-provided software to

configure the necessary databases to ensure that they, like the Centrisoft object code itself, were

capable of being backed up by Verizon's regularly scheduled automated backup systems.

Although Fog Cap offers the opinion testimony of its information technology expert Rob Miller

that he disagrees with Gralnik's opinion that "an operating version of the Centrisoft . . . software

application suite exists" on the restored server, Miller's disagreement with that statement of

opinion is expressly based solely on the fact that the software on the restored server does not run

properly when launched, and nothing in Miller's testimony in any sense contradicts Gralnik's

opinion that the *reason* the software does not run properly is that the requisite databases were not

backed up completely and were therefore not restored in an immediately usable condition.

Indeed, Miller specifically testifies that among the first things he noted in examining the restored

server were problems with the "Centrisoft specific databases," including that "[m]any" of the

databases "were detached from the SQL Server installation which renders them useless from a

database standpoint," and that when he attempted to launch a Centrisoft application "it did not

work as expected because the database, 'CenterwiseSystem' couldn't be located on the server."

Notwithstanding Fog Cap's failure to run a production copy of the software on the

restored server in July 2009, Fog Cap did not request further assistance from Verizon.  In

September 2009, lacking any notice that Fog Cap believed the restoration had been unsuccessful,

Verizon disposed of all copies in its possession of the Centrisoft server backups, its contractual

obligation to continue storing those backups having come to an end.

In late 2010, Fog Cap moved its offices. In connection with that move, Fog Cap elected to physically destroy the hard drives of approximately "ten to fifteen" desktop computers that had been used by Centrisoft's team of software engineers prior to their termination. Testimony from Centrisoft's former employees indicates that the source code for Centrisoft's software product was available to Centrisoft's software engineers locally on the desktop and server machines in Centrisoft's offices, that parts or the entirety of the software product were stored on some or all of the desktop computers, and that there were tape backups of the source code in Centrisoft's offices at the time of the employees' termination. At no time prior to the destruction of the hard drives did Fog Cap make any attempt to ascertain what was on the hard drives, or whether an operating version of Centrisoft's software product could be compiled from them. Against the former Centrisoft employees' testimony that the source code existed in whole or in part on the destroyed hard drives, Fog Cap offers the opinion testimony of Miller that it is "unlikely" that the desktop computer hard drives destroyed in 2010 would have had a "full working copy" of the Centrisoft software product. Miller does not offer his opinion as to whether usable source code existed on the destroyed hard drives at the time of their destruction.

At all material times and up to the present, Fog Cap retained one or more servers that had been located in Centrisoft's offices rather than hosted by Verizon. Verizon offers Gralnik's expert opinion that "multiple versions" of the complete source code for the Centrisoft software product are stored on a still-extant and still-operational server designated as "BUILDMASTER" that survived the 2010 destruction of hard drives. Fog Cap does not dispute that the source code exists on that machine, but offers Miller's testimony that it would require "hundreds if not

thousands of hours by engineers with an intimate knowledge of the source code" to compile

usable object code from the BUILDMASTER source code.

Approximately seven months after it destroyed the Centrisoft desktop computer hard

drives, Fog Cap initiated this lawsuit.

## ANALYSIS

Verizon moves the court both for imposition of sanctions and for summary judgment as

to each of Fog Cap's claims. I consider the merits of each motion in turn.

## I.    Motion (#102) for Imposition of Sanctions

The gravamen of Verizon's motion for imposition of sanctions is that Fog Cap's

undisputed failure to retrieve an operational copy of the Centrisoft software product from

Newton either before or after it terminated his employment and its undisputed destruction in

2010 of ten to fifteen desktop computer hard drives that "may have contained operational copies

of the Centrisoft software and source code" each constitute sanctionable spoliation of evidence.

By and through its motion, Verizon primarily seeks dismissal of all of Fog Cap's claims, but in

the alternative seeks an adverse evidentiary instruction and exclusion of portions of Miller's

expert testimony.

Sanctions available in connection with a party's spoliation of evidence include dismissal

of claims, exclusion of evidence, and adverse jury instructions. However, before a court may

impose any sanction in connection with such spoliation, it must first find that the destruction of

evidence was "willful." *See Unigard*, 982 F.2d at 368, 368  n. 2; *see also Glover*, 6 F.3d at 1329;

*Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991). In particular, before the "harsh

sanction" of dismissal may be imposed, the court must find that "the conduct to be sanctioned

[was] due to willfulness, fault, or bad faith." *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995) (citations omitted).

A party's destruction of evidence is considered "willful" if the party "ha[d] some notice that the [evidence was] *potentially* relevant to the litigation before [it was] destroyed." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (emphasis original; citations omitted). Because the relevance of destroyed evidence generally cannot be authoritatively established, a party "can hardly assert any presumption of irrelevance" as to the destroyed evidence. *Id.*, *quoting Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982).

It is generally accepted that the duty to preserve evidence attaches when a party knows or should know that such evidence may be relevant to litigation that is "anticipated" or "reasonably foreseeable." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590, 591 (4th Cir. 2001), *citing Kronisch v. United States*, 150 F.3d 112, 126 (2nd Cir. 1998); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *see also, e.g., United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001-1002 (9th Cir. 2002). As the Federal Circuit recently explained, "[w]hen litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011), *citing Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2nd Cir. 2001). Although "this standard does not trigger the duty to preserve documents from the mere existence of a potential claim or the distant possibility of litigation, . . . it is not so inflexible as to require that litigation be imminent, or probable without significant contingencies . . . ." *Id.* (citations and internal quotations omitted); *but cf., e.g., Realnetworks, Inc. v. DVD Copy Control Ass'n*, 264 F.R.D.

517, 524 (N.D. Cal. 2009) (holding that litigation must be "probable" before the duty to preserve evidence is triggered); *Hynix Semiconductor Inc. v. Rambus, Inc.*, 591 F.Supp.2d 1038, 1061 (N.D. Cal. 2006) (same); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006) (same).

As discussed above, in April 2009 Fog Cap believed that it "absolutely needed the [Centrisoft] software to remain in place" when Verizon returned the Centrisoft servers to it. In May 2009, Verizon returned the Centrisoft servers to Fog Cap with all of the data erased therefrom, including the Centrisoft software. Construing as adopted in good faith Fog Cap's position that loss of the particular production copy of the software that had been stored on the servers hosted by Verizon would cause Fog Cap to suffer in excess of $7.5 million in damages, I find that litigation with Verizon was reasonably foreseeable to Fog Cap by not later than May 2009, when Fog Cap received the Centrisoft servers in erased condition. Fog Cap's obligation to preserve potentially relevant evidence therefore attached in May 2009, before Fog Cap terminated Newton's appointment and before Fog Cap intentionally destroyed the ten to fifteen Centrisoft hard drives. Moreover, because Newton had in his possession operational copies of the Centrisoft software object code, and because the destroyed hard drives may have contained source code from which an operational version of the software could have been compiled, Fog Cap necessarily had notice that the unpreserved evidence was potentially relevant to the reasonably foreseeable litigation. Verizon's motion for imposition of sanctions is therefore well taken.

However, I disagree with Verizon that the dismissal sanction is an appropriate response to Fog Cap's willful spoliation of evidence. Notwithstanding the clear potential relevance of the

Page 14 - OPINION AND ORDER

destroyed and discarded evidence to Fog Cap's theory of *damages*, no element of any of Fog

Cap's claims of Verizon's *liability* could have been negated by the discovery of an operational

copy of the software (or of readily compilable source code) on one or more of the hard drives had

they not been destroyed, or on Newton's disks had they not been discarded. That is, Verizon's

failure to perform backups of the Centrisoft servers in breach of the Hosting Agreement, if

established, would remain a breach of its contractual obligations notwithstanding the existence of

an alternate copy of the software; Verizon's actionable negligence in connection with its return of

the servers, if established, would not cease to be negligence in the event Fog Cap had

successfully mitigated its damages by locating an alternate copy; Verizon's violation of the terms

of its bailment of the servers, if established, would still sound in tort despite any party's success

in recompiling a new production copy from source code. Because Fog Cap's spoliation

necessarily did not deprive Verizon of any complete defense to any of Fog Cap's claims of

liability, imposition of the dismissal sanction would be inappropriate here.

      I find instead that the appropriate sanction in response to Fog Cap's willful spoliation of

evidence would, *ceteris paribus*, be to instruct the jury at trial of this matter that it could properly

infer from Fog Cap's failure to preserve the hard drives and disks that they contained evidence

favorable to Verizon, and to exclude from trial Fog Cap's proffered expert testimony regarding

the likelihood that the unpreserved evidence contained usable software or source code. However,

because for reasons set forth below I find that Verizon is entitled to summary judgment in its

favor as to each of Fog Cap's claims against it, rather than impose any such evidentiary sanctions,

I instead deny Verizon's motion for imposition of sanctions as moot.

II.    **Motion (#108) for Summary Judgment**

As noted above, Fog Cap brings three claims against Verizon:  breach of contract, negligence, and violation of bailment.  I address the parties' arguments in connection with each in turn, below.

A.    **Fog Cap's Breach of Contract Claim**

Fog Cap's breach of contract claim is premised exclusively on Verizon's alleged failure to maintain backups of the data stored on the Centrisoft servers it was hosting, as Verizon was required to do under the terms of the parties' Hosting Agreement.  In support of its theory that Verizon breached its obligation to perform daily and weekly backups of the data on the Centrisoft servers, Fog Cap relies exclusively on its proffered evidence that the Centrisoft software did not run properly following Verizon's restoration of the Centrisoft server in June and July 2009.

As noted above, the Hosting Agreement expressly provides that is to be governed by New York law.  No party disputes that New York law governs Fog Cap's breach of contract claim. Under New York law, the elements of a claim for breach of contract are the formation of a valid contract between the parties, performance of the plaintiff's obligations under the contract, failure of the defendant to perform its obligations under the contract, and resultant damages to the plaintiff. *See Torok v Moore's Flatwork & Founds., LLC*, 106 A.D.3d 1421, 1422 (N.Y. App. Div. 2013) (citations omitted).  "If an agreement is clear, complete and unambiguous, the contract should be enforced according to its terms, reading the document as a whole to put the words and phrases in proper focus. . . ." *Harrison & Burrowes Bridge Constructors, Inc. v. State of New York*, 42 A.D.3d 779, 780 (N.Y. App. Div. 2007).  In the absence of any contrary statute

Page 16 - OPINION AND ORDER

or public policy, exculpatory and liability-limiting clauses are enforceable under New York

contract law, other than limitations on liability for gross negligence or reckless misconduct. *See*

*Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 553-554 (1992).

There is no dispute as to whether the parties had entered into a valid contract, and no

evidence of record suggests that either Centrisoft or Fog Cap failed to perform its obligations

under the Hosting Agreement. The parties therefore offer arguments only as to Verizon's

compliance with its contractual obligations and as to damages.

As to the question of Verizon's compliance, no finder of fact could reasonably conclude

on the basis of the evidence of record that Verizon failed to perform its obligations under the

Hosting Agreement. As noted above, Verizion offers testimonial and other evidence that it

performed daily and weekly backups of Centrisoft's servers, in satisfaction of its obligation to do

so under the parties' agreements. Fog Cap offers no evidence to the contrary, but rather offers the

*res ipsa loquitur* argument that, because the Centrisoft software would not run properly after the

Centrisoft server had been restored from backup, Verizon's regularly performed backups must

necessarily have been so inadequate as to constitute breach of the agreement. There are two

independently fatal flaws in Fog Cap's argument. First, the parties' Hosting Agreement expressly

stated that Verizon's backups would not be effective to back up Centrisoft-created databases

absent Centrisoft's proper performance of specified database software management tasks

(including configuring its databases for backup using Verizon-provided Microsoft SQL Server

software), and Verizon has offered competent evidence tending to support the conclusion that the

restoration of the server was successful other than with respect to such databases. Fog Cap's

proffered expert testimony that the software did not run due to failure to locate or to read

Page 17 - OPINION AND ORDER

necessary databases is not in any material sense to the contrary, and is therefore insufficient to create a question of fact as to whether the restoration from backup was successful, let alone as to whether Verizon complied with its contractual obligation to perform regular backups of Centrisoft's servers and/or to restore those servers from backups in the event of server failure.

Second, even if there were a question of fact as to whether Verizon's attempt to restore the server from backup had been successful, as noted above the parties' Hosting Agreement did not guarantee that Verizon's backups would meet any particular industry or other standard of quality, but rather expressly made "no warranties, express or implied" regarding its backup services and expressly "disclaim[ed] any and all implied warranties" in connection with its provision of services, including backup services. In light of Verizon's disclaimer of any express or implied warranty in the quality of its backups, the undisputed evidence that Verizon in fact performed regular daily and weekly backups of the servers is sufficient to establish Verizon's compliance with its backup obligations under the contract, notwithstanding any possible imperfection in the quality of its backups.

Moreover, even if there were a question of fact as to whether Verizon had failed to perform its obligations under the Hosting Agreement, as noted above, the parties' agreement contained a provision limiting Verizon's potential liability to Fog Cap to the lesser of Fog Cap's proven direct damages or the amount paid by Fog Cap to Verizon under the Hosting Agreement during the six month period immediately preceding accrual of Fog Cap's cause of action in connection with the contract. The parties agree that during the six month period immediately preceding accrual of Fog Cap's cause of action for breach, Fog Cap made no payments to Verizon under the Hosting Agreement. In the absence of evidence from which a finder of fact could

Page 18 - OPINION AND ORDER

reasonably conclude that Verizon intentionally breached its backup obligations or was "recklessly indifferent" as to whether it was in compliance with its backup obligations – and Fog Cap has offered no such evidence – no principle of New York law precludes enforcement of the parties' negotiated liability-limitation provision. *See, e.g., Sommer*, 79 N.Y.2d at 553-554; *Abacus Fed. Sav. Bank v ADT Sec. Servs., Inc.*, 18 N.Y.3d 675, 682-683 (2012). In consequence, even if the record contained evidence that Verizon failed to comply with its obligations under the Hosting Agreement, Fog Cap's recovery for Verizon's putative breach would be limited to zero. Because this court would, under those circumstances, be precluded from issuing any award of damages on Fog Cap's breach of contract claim – and because Fog Cap seeks only damages in connection with its claim – Fog Cap would be precluded from obtaining redress for the putative breach as a matter of New York contract law. Because redressability is one of the three "irreducible constitutional minimum" requirements of Constitutional standing, *see Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139, 1146-1147 (9th Cir. 2013), *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992), this court would, in light of the parties' enforceable liability-limitation provision, lack jurisdiction to consider Fog Cap's breach of contract claim even if Fog Cap had proffered evidence tending to support the conclusion that Verizon had breached its obligations under the Hosting Agreement.[2]

---

[2] Additionally, although the parties do not for present purposes offer argument specifically regarding Fog Cap's theory that loss of the production copy of the software stored on the servers hosted by Verizon caused Fog Cap to incur damages in excess of $7.5 million dollars – the total amount of Fog Cap's investment in Centrisoft – I have grave concerns regarding whether the record can be interpreted as supporting Fog Cap's theory that Verizon's complained-of conduct, if established, could have caused Fog Cap to incur other than nominal damages. Fog Cap is very clear in its contention that Verizon's complained-of conduct caused the loss only of the object code or production copy of the software, and not any of the underlying source code. Fog Cap concedes that it has all of the underlying source code within its possession and control,

For the foregoing reasons, Verizon's motion for summary judgment is granted as to Fog Cap's breach of contract claim.

### B.    Fog Cap's Negligence Claim

Fog Cap's negligence claim is pled (in Fog Cap's Fourth Amended complaint and in all previous versions of Fog Cap's pleading) as if premised on Verizon's alleged breach of the "reasonable duty of care [owed by] a company which operates a data hosting facility [to its customers]." By and through its moving papers, Verizon argued that it was entitled to summary judgment as to Fog Cap's negligence claim on the ground that its duty to Fog Cap *qua* "data hosting facility" was entirely governed by the parties' Hosting Agreement, such that no common-law claim of negligence could lie under Oregon law for purported breach of that duty. In opposition to Verizon's motion, Fog Cap for the first time took the position that its negligence claim was premised, not on breach of any duty Verizon owed to Fog Cap arising out of their contract-governed business relationship, but rather on breach of a duty purportedly created by

---

but unequivocally takes the position that it would be too costly and/or time-consuming to work with the source code to create marketable software. Under those circumstances, it appears highly likely that the purportedly lost object code was without significant value to Fog Cap or to any prospective or hoped-for buyer, whether an end-user or a developer, before it was purportedly lost: end users would not find value in the software because absent the source code the application could not be updated or modified in any respect, including to make it run on currently standard operating systems, and because absent the source code effective end-user software support services would be virtually impossible; prospective purchasers of the rights to develop and sell the software would find no value in the object code standing alone, because absent the source code it would be necessary to redevelop the software package starting from scratch, such that no advantage would obtain to such a developer from purchasing rights to the software from Fog Cap. Moreover, the evidence establishes that as of 2008 Fog Cap had reported to the SEC that it had written the value of its total investment in Centrisoft down to zero. However, because this issue has not been briefed to the court, and because notwithstanding the foregoing Fog Cap could establish that it had incurred nominal damages in consequence of the loss of the object code, I do not rely on the evident flaws in Fog Cap's theory of damages in my disposition of Verizon's motion.

Page 20 - OPINION AND ORDER

Verizon's oral assent to Fog Cap's oral request of April 2009 that Verizon return the Centrisoft

servers to Fog Cap without first erasing the data therefrom.

The parties agree that Fog Cap's negligence claim is governed by Oregon law.  Under

Oregon law, to establish actionable negligence, a plaintiff must prove:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is
> to an interest of a kind that the law protects against negligent invasion, (3) that
> defendant's conduct was unreasonable in light of the risk, (4) that the conduct was
> a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons
> and plaintiff's injury was within the general type of potential incidents and injuries
> that made defendant's conduct negligent.

*Solberg v. Johnson*, 306 Or. 484, 490-491 (1988), *citing Fazzolari v. Portland School Dist. No.*

*1J*, 303 Or. 1, 5 (1987).

In analyzing Fog Cap's negligence claim, I note first that the parties' Hosting Agreement

expressly governed Verizon's duties and responsibilities regarding its possession and control of

the Centrisoft servers, and that, as discussed above, it expressly constituted the parties' "entire

agreement" with respect to those duties and responsibilities, "supersed[ing] all other

representations" such as those made in the course of the April 2009 conference call.  Moreover,

the Hosting Agreement expressly further provided that its terms and conditions could not be

amended except through a signed writing.  As a matter of New York contract law, therefore, the

terms and conditions of the parties' Hosting Agreement governed the duties Verizon owed to Fog

Cap in connection with the return of the servers, notwithstanding any statements made in the

course of the April 2009 conference call.  Under Oregon law, one party to a contract may be

liable to another for negligent performance of that party's contractual duties only where that party

owes the other a duty "independent of the contract and without reference to the specific terms of

the contract," *Georgetown Realty v. Home Ins. Co.*, 313 Or. 97, 110, 111 (1992), and where a

claim is premised instead on breach of a duty created by contract, the remedy for the breach lies

exclusively in contract rather than in tort, *see Securities-Intermountain, Inc. v. Sunset Fuel Co.*,

289 Or. 243, 259 (1980). Here, because the parties' agreement did not permit Fog Cap to impose

any new extra-contractual obligation on Verizon absent a signed writing, statements made in the

course of the April 2009 teleconference could not have created any new duty owed by Verizon to

Fog Cap regarding the Centrisoft servers. In consequence, Verizon did not owe Fog Cap any

duty independent of the duties created by the Hosting Agreement. Additionally, because the

parties' Hosting Agreement expressly permitted Verizon to delete data from hosted servers upon

the termination of the hosting relationship, Verizon did not breach the terms and conditions of

the Hosting Agreement by erasing the data therefrom. Thus, under *Georgetown Realty* and

*Securities-Intermountain*, Fog Cap's negligence claim cannot lie.

Moreover, even if Verizon's complained-of conduct were actionable as negligence,

the damages Fog Cap would be entitled to recover from Verizon in connection with that

negligence are necessarily limited to zero. As noted above, the Hosting Agreement expressly

provides that "[t]he total liability of [Verizon] to [Fog Cap] *in connection with* th[e] [Hosting]

Agreement, for any and all causes of action and claims, including, without limitation, . . .

negligence . . . and other torts," is limited to the lesser of Fog Cap's proven direct damages or  the

amount paid by Fog Cap to Verizon under the Hosting Agreement during the six month period

immediately preceding accrual of such cause of action (emphasis supplied). The courts of the

Ninth Circuit have held that "phrase[s] such as 'arising out of' or 'arising under[]' [a contract] . . .

limit the [scope of the] clause[s in which they appear] to disputes concerning the contract itself,"

whereas "the plain meaning of the phrase 'arising in connection with' suggests a broader scope," one sufficiently broad to "reach[] every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) (citations, some internal quotation marks omitted). Construing the premises underlying Fog Cap's negligence claim in the light most favorable to it, the conclusion is inescapable that the parties' dispute over Verizon's conduct in connection with its return of the servers arises "in connection with" the parties' Hosting Agreement. But for the Hosting Agreement, Verizon would never have had the servers in its possession; the terms of the Hosting Agreement could not as a matter of New York law have been modified or superceded by any statements made in the course of the April 2009 conference call and therefore exclusively governed any duty of care Verizon could have owed Fog Cap in connection with the return of the servers; the purported duty upon which Fog Cap's claim is based relates exclusively to goods that are exclusively governed by the Hosting Agreement. As discussed above, under New York law the Hosting Agreement's liability-limitation provision is enforceable, and pursuant to that provision, Fog Cap's potential recovery on its claim is limited to zero. The limitation of Fog Cap's potential damages to zero deprives this court of jurisdiction to consider its negligence claim. *See Wash. Envtl. Council*, 732 F.3d at 1139, 1146-1147; *Lujan*, 504 U.S. at 560-561.

It also appears likely, in the alternative, that Fog Cap's negligence claim would necessarily fail pursuant to the so-called "economic loss doctrine."

> Under the economic loss doctrine, "[O]ne ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property." *Hale v. Groce*, 304 Ore. 281, 284, 744 P.2d 1289 (1987). Damages for purely

> economic losses, however, are available when a defendant has a duty to guard
> against the economic loss that occurred. *Onita*, 315 Or. at 159. A duty to protect
> against economic loss can arise "from a defendant's particular status or
> relationships, or from legislation, beyond the generalized standards that the
> common law of negligence imposes on persons at large." *Fazzolari v. Portland
> School Dist. No. IJ*, 303 Ore. 1, 10, 734 P.2d 1326 (1987).

*Paul v. Providence Health System-Oregon*, 351 Or. 587, 593 (2012) (modifications original;

footnote omitted). Nothing in the record here suggests that Verizon and Fog Cap, whose

relationship was created through arms'-length negotiation, were in the kind of "special

relationship" that could give rise to a duty to guard against economic loss, particularly in light of

the provisions sharply delimiting the liability each party could bear to the other under the parties'

Hosting Agreement and Reseller Agreement. And although the Oregon courts have not

apparently weighed in on the question, multiple other courts have concluded that the loss of

software constitutes a purely economic loss, as opposed to damage to person or tangible property.

*See, e.g.*, *Am. Online, Inc. v. St. Paul Mercury Ins. Co.*, 347 F.3d 89, 94-96 (4th Cir. 2003);

*Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 819 (3rd Cir. 1994).[3]

---

[3] Pointing to Fog Cap's failure to request return of Newton's copies of the operational software before he discarded his disks, its  failure to make any backup of the software whatsoever at any time following its acquisition of Centrisoft's assets (in a drastic departure from Centrisoft's prior practice), its willful destruction of Centrisoft's desktop computer hard drives without any determination of what was stored on them, its failure to inspect or inventory what was on the computer equipment Fog Cap acquired at the time of acquisition, its failure to download the software from the Centrisoft servers before they were returned to it, and its failure to make any effort to compile the software package from available source code, Verizon argues that no finder of fact could reasonably conclude that Fog Cap was not at greater fault in the loss of the production copy of the software than Verizon. I agree with Verizon that if Fog Cap's greater comparative fault were established, its negligence claim would fail as a matter of Oregon Statutory law. *See* Or. Rev. Stat. 31.600. I further agree with Verizon that the undisputed evidence establishes Fog Cap's egregious failure to mitigate its purported damages, and that, if Fog Cap's claims were to go to trial, it would have a heavy burden to establish entitlement to damages in light of its clear failure to mitigate. However, mitigation of damages is generally a question within the province of the jury, and I disagree with Verizon that the identified evidence

For the foregoing reasons, Verizon's motion for summary judgment is granted as to Fog Cap's negligence claim.

### C.    Fog Cap's Bailment Claim

Like its negligence claim, Fog Cap's bailment claim, although not pled as such, is necessarily (if tacitly) premised on the parties' communications in the course of the April 2009 conference call.  It is clear that the parties' Hosting Agreement created a bailment relationship between the parties, whereby Verizon was to serve as the bailee of Fog Cap's servers under terms and conditions specified in the parties' contract.  Fog Cap's position is that Verizon breached the terms of the bailment by returning the servers to it with all of the data erased therefrom (it concedes that the servers suffered no other cognizable damage), but it is clear, as discussed above, that Verizon did not breach the terms of the parties' written contract when it erased the data from the servers.  Fog Cap's bailment claim is therefore colorable only to the extent construed as premised on a bailment duty to retain the data stored on the servers that can only have been created in the course of the April 2009 conference call.

The parties agree that Fog Cap's bailment claim is governed by Oregon law.  Under Oregon law, "[f]or a bailment to exist, there must be both possession and physical control [of the bailor's property] by the bailee. . . .  Possession is defined to include the intent to exercise control over the goods." *Jackson v. Miller*, 41 Or. App. 669, 671-672 (1979).  Where a gratuitous

--------

bears on the question of the statutory comparative fault analysis.  Fog Cap's failure to ensure that it had multiple copies of the Centrisoft software is clearly relevant to its duty to mitigate damages, but because none of the identified conduct suggests Fog Cap's contributory negligence in causing the loss of the particular copy of the software stored on the hosted servers, it is without relevance to the causation questions raised by Fog Cap's claims.  *See, e.g., Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495, 509-510 (2010).  I therefore do not rely on analysis of Fog Cap's comparative fault in my disposition of Verizon's motion.

Page 25 - OPINION AND ORDER

bailment exists, the bailee owes the bailor a duty of reasonable care to prevent damage to the bailed goods. *See Koennecke v. Waxwing Cedar Products, Ltd.*, 273 Or. 639, 648 (1975). However, where a bailment is not gratuitous, it appears that the standard of care owed by the bailee to the bailor is generally governed by the terms of the parties' agreement. It is undisputed that Verizon was at material times in possession of the Centrisoft servers, and although Verizon argues that it was not in "control" of the software stored thereon, due to Centrisoft's/Fog Cap's retention of administrative rights over the data on the servers while they were in Verizon's possession, its argument is patently untenable in light of its election to erase all of the data from the servers, including the software, notwithstanding Fog Cap's express request to the contrary. As a matter of Oregon law, Verizon and Fog Cap were in a bailment relationship with regard to the Centrisoft servers.

For the same reasons discussed above in connection with Fog Cap's negligence claim, the terms and conditions of the parties' bailment relationship were necessarily governed exclusively by the parties' Hosting Agreement. That agreement expressly created the bailment of the servers and comprehensively specified the parties' rights and obligations in connection with that bailment. It also expressly constituted the parties' entire agreement regarding that bailment, and provided that its terms and conditions could not be modified except through a signed writing. In consequence, the terms and conditions of the bailment could not have been enforceably modified by any oral representation made in the course of the April 2009 conference call. Because Verizon did not violate the written terms and conditions of its bailment of the servers when it deleted the data therefrom, it follows that Fog Cap's bailment claim fails on its merits as a matter of law.

Also as discussed in connection with Fog Cap's negligence claim, even if the bailment claim had facial merit, this court would lack jurisdiction to consider its merits because the parties' Hosting Agreement enforceably limits any recovery Fog Cap could obtain in connection with that claim to zero. *See Wash. Envtl. Council*, 732 F.3d at 1139, 1146-1147; *Lujan*, 504 U.S. at 560-561. Even more clearly than the negligence claim, the bailment claim arises "in connection with" the parties' Hosting Agreement, in that the agreement created the bailment, governed its terms and conditions, and largely gave rise to the parties' relationship.

For the foregoing reasons, Verizon's motion for summary judgment is granted as to Fog Cap's bailment claim.

## CONCLUSION

For the reasons set forth above, Verizon's motion (#102) for imposition of sanctions is denied as moot, and Verizon's motion (#108) for summary judgment is granted in its entirety. A final judgment shall be prepared.


Dated this 12th day of November, 2014.

Honorable Paul Papak
United States Magistrate Judge